BARRETT S. LITT (No. 45527)
blitt@mbllegal.com
DAVID S. McLANE (No.124952)
dmclane@mbllegal.com
CAITLIN S. WEISBERG (No. 262779)
cweisberg@mbllegal.com
McLANE, BEDNARSKI & LITT, LLP
975 East Green Street
Pasadena, California 91106
Tel: (626) 844-7660
Fax: (626) 844-7670

Attorneys for Plaintiff Arturo Aceves Jimenez

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ARTURO ACEVES JIMENEZ,<br><br>Plaintiff,<br><br>vs.<br><br>CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, PATRICIA GUERRA, GEORGE LOU LEIKER, SAL LaBARBERA, DOMINICK FUENTES, AND DOES 1-10, INCLUSIVE,<br><br>Defendants. | **Case No.:**<br><br>**COMPLAINT FOR DAMAGES:**<br><br>1) DEPRIVATION OF CIVIL RIGHTS BY INDIVIDUAL DEFENDANTS (42 U.S.C. § 1983)<br><br>2) DEPRIVATION OF CIVIL RIGHTS BY ENTITY DEFENDANT [CITY OF LOS ANGELES] (42 U.S.C. § 1983, *MONELL*)<br><br>3) DEPRIVATION OF CIVIL RIGHTS BY ENTITY DEFENDANT [COUNTY OF LOS ANGELES] (42 U.S.C. § 1983, *MONELL*)<br><br>4) INTERFERENCE BY THREATS, INTIMIDATION, OR COERCION WITH CIVIL RIGHTS (CALIFORNIA CIVIL CODE § 52.1)<br><br>**DEMAND FOR JURY TRIAL** |

COMPLAINT

# I.   __INTRODUCTION__

1.      This civil rights action seeks compensatory and punitive damages from Defendants for causing Plaintiff to be deprived of rights, privileges, and immunities secured by the Constitution and laws of the United States and the State of California in relation to the wrongful investigation, arrest, prosecution, conviction, and incarceration of Plaintiff Arturo Jimenez for a crime that he did not commit.

2.      On or about November 17, 1994, at the age of eighteen (18), Plaintiff Arturo Jimenez was arrested and charged with the murder of Hugo Colmenarez, a gang-related shooting that he did not commit. He was wrongfully convicted the following year, in 1995. Post-conviction investigation ultimately revealed not only the identity of the true killer, but also previously undisclosed evidence that the State's only identifying eyewitness was pressured into making an erroneous identification and that, early in the investigation, a different eyewitness conclusively excluded Jimenez as the killer. Based on this evidence, after more than twenty-five years of wrongful incarceration, the Los Angeles County District Attorney's office conceded that Jimenez's conviction was unconstitutional, and the Los Angeles Superior Court vacated his conviction. Based on a joint motion from the prosecution and Jimenez, the Los Angeles Superior Court issued a finding of factual innocence, recognizing that Jimenez did not, in fact, commit the crime.

3.      Hugo Colmenarez was shot at a gas station at around 2:00 a.m. on September 18, 1994, during a gang altercation between himself (a Reseda gang member) and fifteen to twenty Harpys gang members. Jimenez was not present at the gas station at the time of the shooting, but he was in the neighborhood and drove to the gas station when he heard the gunshots because he was worried that someone he knew may have been hurt. He saw the victim bleeding in the arms of a friend and told the friend to get the victim to the hospital. As he was driving away,

he was recognized by Defendant Fuentes, a Los Angeles police officer who was responding to the scene of the shooting.

4.     Jimenez's wrongful conviction was the result of police misconduct, set within a broader custom and practice during the 1994-1995 time period within the Los Angeles Police Department (LAPD) and the Los Angeles District Attorney's Office (LADA) of deliberate indifference to the due process rights of individuals charged with crimes.

5.     The law enforcement officers investigating the Colmenarez murder could only identify two Harpys—out of more than fifteen to twenty—who were at or near the location of the murder around the time of the shooting, one of whom was Jimenez. Both were excluded as the shooter by eyewitnesses, but through coercion and unduly suggestive identification practices, Defendants Leiker and Guerra extracted an unreliable identification of Jimenez from a different witness, Mayra Martinez, and that sole identification became the basis of Jimenez's conviction. No physical or forensic evidence ever connected Jimenez to the shooting, and several witnesses later testified at trial that Jimenez was not even present at the gas station at the time of the shooting.

6.     In addition to generating an unreliable identification, the defendant detectives suppressed the statement of the witness (Llamily Chavez) who excluded Jimenez as the shooter, along with other significant exculpatory and impeachment evidence described more fully herein. The Defendants also falsified evidence used against Jimenez at trial, including purported statements by other witnesses in the days following the shooting that were never made. And after Martinez testified at trial that she saw the shooter get in the passenger seat of Jimenez's vehicle (a blue Blazer), Defendant Fuentes changed his testimony to match, stating falsely and contrary to his earlier statements, that he, too, saw Jimenez in the passenger seat, instead of the driver's seat.

7.      In this manner, the defendant law enforcement officers fabricated a case against Jimenez that never existed and that was undermined by exculpatory evidence in their possession, just because he was the only person they could place near the scene of the crime at the time of the shooting. This was all done despite the defendants' awareness of Jimenez's innocence and the unreliability of their sole identification.

## II.    JURISDICTION AND VENUE

5.      This action is brought by Plaintiff ARTURO ACEVES JIMENEZ ("Plaintiff" or "JIMENEZ").

6.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction), 28 U.S.C. § 1343 (civil rights jurisdiction), and 28 U.S.C. § 1367 (supplemental jurisdiction).

7.      The acts and omissions complained of commenced in or around 1994 and continued through 2020 within the Central District of California. Therefore, venue lies in this District pursuant to 28 U.S.C. § 1391.

8.      With respect to the state law causes of action pled herein, Plaintiff timely filed administrative claims with the County of Los Angeles and the City of Los Angeles pursuant to California Government Code § 910. The County of Los Angeles denied Plaintiff's claim on March 16, 2021. The City of Los Angeles denied Plaintiff's claim on March 5, 2021.

## III.    PARTIES

9.      Plaintiff ARTURO ACEVES JIMENEZ ("Jimenez") is, and at all relevant times hereto was, a resident of the State of California.

10.      Defendant COUNTY OF LOS ANGELES (hereinafter "COUNTY") is, and at all times relevant hereto was, a duly authorized public entity or political subdivision organized and existing under the laws of the State of California. The Los Angeles District Attorney's Office (hereinafter "LADA") is, and at all relevant

times was, an agency or subdivision of Defendant COUNTY. The COUNTY and LADA are located within the State of California and within the jurisdiction of the Central District of California. At all relevant times, COUNTY and LADA possessed the power and authority to adopt policies and prescribe rules, regulations and practices affecting the operation of the LADA and the actions of employees of the LADA, including customs, policies and/or practices relating to police tactics, methods, investigations, arrests, evidence, and discovery; as well as to personnel supervision, performance evaluation, internal investigations, discipline, records maintenance, and/or retention. Defendant COUNTY is sued as a local government entity under 42 U.S.C. § 1983 because its customs, policies and/or practices with regard to the operation of the LADA were a moving force behind the constitutional violations claimed by Plaintiff herein.

11.    Defendant CITY OF LOS ANGELES (hereinafter "CITY") is, and at all times relevant hereto was, a duly authorized public entity or political subdivision organized and existing under the laws of the State of California. The Los Angeles Police Department (hereinafter "LAPD") is, and at all relevant times was, an agency or subdivision of Defendant CITY. The CITY and LAPD are located within the State of California and within the jurisdiction of the Central District of California. At all relevant times, CITY and LAPD possessed the power and authority to adopt policies and prescribe rules, regulations and practices affecting the operation of the LAPD and the actions of employees of the LAPD, including customs, policies and/or practices relating to police tactics, methods, investigations, arrests, evidence, and discovery; as well as to personnel supervision, performance evaluation, internal investigations, discipline, records maintenance, and/or retention. Defendant CITY is sued as a local government entity under 42 U.S.C. § 1983 because its customs, policies and/or practices with regard to the operation of the LAPD were a moving force behind the constitutional violations claimed by Plaintiff herein.

12.    At all times relevant herein, Defendant PATRICIA GUERRA ("Guerra") was employed by and working on behalf of the LAPD and resided within the jurisdiction of the State of California. In her capacity as a LAPD detective and employee, she acted under color of law and actively participated in the investigation resulting in the wrongful arrest, prosecution, conviction, and incarceration of Plaintiff. Defendant Guerra is sued in her individual capacity.

13.    At all times relevant herein, Defendant SAL LaBARBERA ("LaBarbera") was employed by and working on behalf of the LAPD and resided within the jurisdiction of the State of California. In his capacity as a LAPD detective and employee, he acted under color of law and actively participated in the investigation resulting in the wrongful arrest, prosecution, conviction, and incarceration of Plaintiff. Defendant LaBarbera is sued in his individual capacity.

14.    At all times relevant herein, Defendant GEORGE LOU LEIKER ("Leiker") was employed by and working on behalf of the LAPD and resided within the jurisdiction of the State of California. In his capacity as a LAPD detective and employee, he acted under color of law and actively participated in the investigation resulting in the wrongful arrest, prosecution, conviction, and incarceration of Plaintiff. Defendant Leiker is sued in his individual capacity.

15.    At all times relevant herein, Defendant DOMINICK FUENTES ("Fuentes") was employed by and working on behalf of the LAPD and resided within the jurisdiction of the State of California. In his capacity as a LAPD officer and employee, he acted under color of law and actively participated in the investigation resulting in the wrongful arrest, prosecution, conviction, and incarceration of Plaintiff. Defendant Fuentes is sued in his individual capacity.

16.    At present time, the true names and capacities of Defendants sued herein as DOES 1 through 10 are unknown to Plaintiff. At all relevant times, DOES 1-10 were police officers, detectives, sergeants, captains, commanders, chiefs of police, civilian employees, agents, policy makers, and/or representatives

of the LAPD or LADA, as well as employees, agents, policymakers and representatives of Defendants CITY and/or COUNTY. At all relevant times, DOES 1-10 were acting under color of law and within the course and scope of their employment. DOES 1-10 are natural persons and are sued in their individual and official capacity. Upon information and belief, the true names, capacities, and acts/omissions of DOE Defendants are contained in records, documents, and other discovery that is unavailable to Plaintiff and can only be ascertained through the discovery process. Upon information and belief, each of the DOE Defendants was in some manner responsible for the violation of Plaintiff's rights and resulting injuries, as alleged herein, and Plaintiff will ask leave of this Court to amend the complaint to allege such names and responsibility when that information is ascertained.

## IV.    GENERAL ALLEGATIONS

17.   At all relevant times, each and every Defendant was the agent and/or employee and/or co-conspirator of each and every other Defendant and was acting within the scope of such agency, employment and/or conspiracy and/or with the permission and consent of other co-Defendants and/or at the direction of the other co-Defendants and/or committed acts/omissions that were ratified by the other co-Defendants.

18.   Each of the Defendants caused and is responsible for the unlawful conduct and resulting injury herein alleged by, *inter alia*, personally participating in the conduct; acting jointly and/or in concert with the conduct of others; authorizing and/or acquiescing to the conduct; failing to intervene and/or take action to prevent the conduct; promulgating policies, procedures, and/or practices (including training) pursuant to which the conduct occurred; failing to promulgate policies, procedures, and/or practices which would have prevented the conduct; failing to initiate and maintain adequate training, supervision, policies, procedures and/or protocols; failing to implement and ensure compliance with policies,

procedures and/or practices to prevent the violation of the rights of individuals, such as Plaintiff; and/or ratifying the conduct of persons under their direction and control.

19. Whenever and wherever reference is made in this complaint to any act/omission by a Defendant, such allegation and reference will also be deemed to mean the acts and omissions of each Defendant individually, jointly, and/or severally.

20. Each paragraph of this complaint is expressly incorporated into each cause of action which is a part of this complaint.

## V.   FACTUAL ALLEGATIONS

## A.   BACKGROUND

21. Plaintiff Arturo Jimenez grew up in Los Angeles, splitting his time between his adoptive parents and his biological parents. He was born into the Aceves family, but was adopted by his biological mother's brother and his wife (Jimenez), who were unable to have biological children of their own. In the Jimenez family, he was an only child with strict, hardworking parents. In the Aceves family, he had a collection of brothers and sisters, who had much more freedom. During his childhood, Plaintiff struggled to find a community where he fit in and to live up to the expectations set by his school and parents, but later on, in the early 1990s, he found belonging with local gang members. Along with three of his brothers, other family, and friends from the neighborhood, he associated with the Harpys street gang.

22. In 1994, Jimenez was living with family in Los Angeles and owned a blue Chevy Blazer, which his parents had given to him. He was the only person who drove the car. On September 17, 1994, he picked up his brother Pedro in his car, purchased some beer, and parked across the street from a local bar, called Mr. X, on 24th Street, near Vermont Avenue, within Harpy's gang territory. They stayed there for several hours, getting drunk. At around 2:00 a.m., while still

parked, they heard gunshots nearby. Thinking that one of their brothers or someone else they knew had been shot, Jimenez and his brother jumped in the Blazer and drove towards the gunshots. After turning onto Vermont avenue, Jimenez saw a lot of people and activity at the gas station at the corner of 22nd and Vermont. He pulled in and saw a girl holding someone on the ground who had been shot, crying and calling for help. Jimenez told her to take the victim to the hospital. At that point, several Harpys jumped into the back seat and told Jimenez to "get the fuck out of [t]here." Jimenez left the gas station and drove away. Jimenez did not have any involvement in the shooting and did not arrive to the gas station until after the shooting.

23.   Colmenarez (14 years old) also spent the evening of September 17, 1994, drinking with friends. He and four other people—Jose Montes (20), Gabriel Casas (20), Mayra Martinez (15), and Llamily Sujey Chavez (15) ("Colmenarez witnesses")—drove to the beach that night. Shortly before 2:00 a.m. on September 18, 1994 (i.e., later that same night), as the group was driving home, Casas received a page and the group stopped at a gas station off of the freeway to make a call. Casas and Colmenarez were members of the Reseda gang. While returning to the car after the phone call, Colmenarez and Casas were approached by two unknown Harpys gang members, and an altercation ensued. Within minutes, several cars with more Harpys members arrived at the gas station and joined the fight. The Colmenarez witnesses reported that there were at least four vehicles and fifteen to twenty Harpys gang members. At that time, upon information and belief, there were hundreds of Harpys gang members, including various subgroups, who were active in Los Angeles. During the altercation, one Harpy pulled out a gun and shot Colmenarez several times, killing him. All of the Harpys fled the scene immediately following the shooting.

24.   At approximately 2:00 a.m. on September 18, 1994, Oscar Sanchez, a Harpys gang member, was on his way to Hoover Park in an unidentified vehicle

when he saw the fight going on at the gas station. He jumped out of the car, shot Colmenarez, and then got back into the same car and left the scene. Sanchez admitted these facts to his then current girlfriend several years after Jimenez's conviction. (*See* Section V(D).)

## B.   LAPD INVESTIGATION

25.   Like Jimenez, LAPD Officers Fuentes and White were near the gas station at 2:00 a.m. on September 18, 1994, and heard the gunshots. In their marked cruiser, they responded in the direction of the gunshots. By the time they arrived at the gas station, there were only two vehicles left, aside from the victim's vehicle. Officers Fuentes and White observed Jimenez's blue Blazer and a maroon Monte Carlo departing the gas station. Recognizing him from a vehicle code citation the week before and from other contacts in the area, Officer Fuentes observed that Jimenez was driving the blue Blazer. Having recognized Jimenez driving the Blazer, Officers Fuentes and White pursued the Monte Carlo and returned it to the scene with the driver, David Hernandez, who was photographed, given a GSR test, and (later that day) arrested.

26.   Detectives Guerra, LaBarbera, and Leiker were assigned to investigate the murder. Detectives Guerra and LaBarbera responded to the gas station in the hours following the shooting on September 18, 1994, oversaw the crime scene investigation, and conducted the initial witness interviews. Detective Leiker joined the investigation within the first few days and served as the prosecution's designated investigating officer at trial. All three were integrally involved in the investigation.

27.   Officer Fuentes communicated with the detectives several times during the investigation, in particular with respect to his observation of the blue Blazer. Fuentes reported to Detectives Guerra and Leiker that he observed Jimenez driving the blue Blazer away from the gas station. Guerra and Leiker documented this fact in their investigation reports and in a search warrant affidavit, signed under oath.

28.   After the shooting, the Colmenarez witnesses remained at the scene until they were transported to the Southwest Area police station for interviews. Between 5:30 and 6:30 a.m., on September 18, 1994, Detective Sal LaBarbera interviewed the two male witnesses, Jose Montes and Gabriel Casas, while Detective Patricia Guerra interviewed the two female witnesses, Mayra Martinez and Llamily Sujey Chavez. All four cooperated with the interviews. For three of the four witnesses, the detectives completed witness statement forms. For witness Chavez, no statement form was ever produced. The witness statement forms that were created by the detectives, and the reports written by the detectives ostensibly to document the witness statements, contained inaccurate information that distorted, fabricated, and misconstrued the information provided by the Colmenarez witnesses. They also omitted material information, including exculpatory and impeachment evidence, and misattributed information. These errors and omissions are set forth in more detail below.

29.   At approximately 7:00 a.m. on September 18, 1994, Gabriel Casas identified David Hernandez (the driver of the Monte Carlo) as someone who had gotten out of the Monte Carlo and had been standing near the shooter when the shooter fired his gun. He did not identify Hernandez as the shooter. Based on Casas's identification, Detectives arrested Hernandez and submitted the case to the Los Angeles District Attorney's Office for prosecution. On September 20, 1994, at 10:30 a.m., the deputy district attorney Greg Somes rejected the case against Hernandez because, based on the identification by Casas, there was "insufficient evidence that Hernandez was any more than an observer." The District Attorney further explained: "In order to hold Hernandez or any one of the approximately 15 Harp[y]s at the scene responsible for the shooters [sic] act we would have to show he had joined in a felonious criminal conspiracy where the shooting was foreseeable. We don't have that evidence."

30.   Aside from David Hernandez, the only other person law enforcement could connect to the scene was the driver of the blue Blazer, Arturo Jimenez. He became the target of the investigation, not because there was any evidence inculpating him, but rather because police officers (Fuentes and White) had placed him at the gas station after the shooting.

31.   According to a statement made by Officer Fuentes to Detective Guerra, he scouted the area around the gas station after the shooting, looking for Jimenez's car. Fuentes reported that he located Jimenez and his Blazer at around 11:35 p.m. on September 19, 1994. Again, according to investigation documentation, Officer Fuentes photographed Jimenez, photographed his Blazer, took down his information, and submitted everything he collected to the detectives at approximately 7:00 a.m. the next morning, September 20, 1994. And as of 10:30 a.m. on September 20, the detectives understood from the district attorney's office rejection notice for David Hernandez that mere presence at the scene was insufficient to bring charges. Four hours after the deputy district attorney's rejection of charges against Hernandez, the detectives secured their first (and only) identification of Jimenez as the shooter, from Mayra Martinez.

32.   At 2:00 p.m. on September 20, 1994, Mayra Martinez and Jose Montes arrived together at the police station to look at display card "A," a photographic lineup (six-pack) that included Jimenez's photograph in position 3. The six-pack was unduly suggestive because none of the other photographs in the six-pack looked like Jimenez's photograph or contained features described by the Colmenarez witnesses. Detectives Leiker and Guerra administered the six-pack to Martinez and Montes.

33.   At or around 2:25 p.m. on September 20, 1994, Mayra Martinez, the only witness who had remained in the car the entire time, in the back seat of the two-door Firebird, signed a statement identifying Jimenez's photograph as the shooter. However, Martinez did not in fact recognize anyone in the photographs

and looked at the photographs for a long time without selecting anyone. Despite her failure to recognize anyone, Detective Leiker instructed Martinez to keep looking. The detectives told Martinez that she could not leave and could not go home unless and until she picked someone. It took Martinez at least 10 minutes of reviewing the photospread and being pressured to make an identification before identifying Jimenez, a fact not disclosed in any LAPD reports or notes. The detectives' actions strongly conveyed to Martinez that they knew who the shooter was and had other evidence of his guilt, that the shooter was in the six-pack, and that failing to identify someone from the six-pack was not an option. Ultimately, she selected Jimenez's photograph, but it was only after she had selected that photograph that Martinez began to feel she had selected the "right" person. By the time she saw Jimenez sitting at the defense table at trial, Martinez was convinced that her identification was correct.

34.   Detective Leiker's repeated instructions to Martinez to keep looking and the detectives' message to Martinez that she could not leave and could not go home unless and until she picked someone were not memorialized in any LAPD report and were not learned by Jimenez and his attorneys until long after he was convicted. That Martinez did not recognize anyone when she first looked at the six-pack and took a long time to select any photograph were also omitted from all written investigation materials. Rather, the police report portrayed Martinez's identification as definitive and unequivocal. In reality, Martinez's identification of Jimenez was the product of suggestion and coercion, not recognition. This was acknowledged, implicitly, by the detectives who did not arrest Jimenez, or seek a search warrant for him, until many weeks later. On September 20, 1994, they were unconvinced, based on Martinez's patently unreliable identification, that he was "the person [that] they were looking for in the investigation," as admitted by detective Guerra at trial.

35.   The same six-pack was then shown to Jose Montes, at or around 3:00 p.m. on the same day, September 20, 1994. Montes did not make an identification. When he was shown display card "A," Montes said that Jimenez's photograph, number 3, "most looks like" the actual shooter because "the rest do not look like the shooter at all." Montes explained that the person in photograph 3 (Jimenez) looked "heavier" than the actual shooter. Montes also said the actual shooter had a darker complexion than the person in photograph 3. The shooter also had dark eyes, almost no hair, acne, and oily skin. In the detectives' subsequent investigation report, they asserted, falsely, that Montes made a "tentative" identification of Jimenez as the shooter.

36.   Detectives Leiker and Guerra brought Gabriel Casas to the police station to look at the six-pack the next day and again one month later. He did not identify Jimenez as the shooter either time. During the September 21, 1994, viewing, Casas did not make any identification and did not identify Jimenez as the shooter. Casas identified several characteristics that the shooter had, including a shaved head (like the persons in the #3 and #5 photos), a thin face (like the person in the #3 photo), and a light mustache (like the persons in the #2, #3, #5, and #6 photos). A month later, on October 27, 1994, detectives confronted Casas with hearsay that he had "recognized" the shooter in the six-pack but hadn't made an identification because he didn't want to get involved. Detectives put Casas through another identification procedure with the same six-pack, with the result that Casas identified Jimenez as someone who was present at the gas station. Nevertheless, he did not state that he recognized Jimenez as the shooter, just that he could not rule him out.

37.   The fourth witness, Llamily Sujey Chavez, was interviewed by detectives at least four times, more than any of the other witnesses. She was a critical eyewitness because she was standing right next to the victim when he was shot. Chavez described the shooter, said she would recognize him if she saw him

again, and provided details about the crime that the other witnesses either had not seen or had not reported (e.g., she was the only one to report that the victim's chain had been grabbed from his neck, that one of the first two Harpys who had started the fight grabbed the chain, and that those same two Harpys ran and got into the Blazer as it was leaving).

38.   However, Chavez's interviews were handled differently than those of the other three witnesses. For the others, the detectives prepared handwritten summaries of their first interviews, on LAPD "Statement Forms," which the three witnesses then signed at the bottom. For Chavez, there is no "Statement Form" in the murderbook. Her statements are reflected (inaccurately) in typed reports by the detectives and in illegible notes contained at the end of the murderbook.

39.   Nevertheless, on September 19, 1994, the day after the murder, Detective Guerra followed up with only one witness: Llamily Sujey Chavez. Detective Guerra called Chavez and went over her statement from the previous day. At that time, Chavez provided a detailed description of the shooter, including a clothing description (which no other witness had previously provided), and said she could identify the shooter if she saw him again. Chavez also said the shooter "may" have gotten into the Blazer, but she was not sure.

40.   On September 26, 1994, eight days after the shooting, Detective Guerra conducted a third interview with Chavez, again by telephone. Chavez again recounted the details of the incident and again said she could identify the shooter if she saw him again. Significantly, Chavez also told Detective Guerra that the driver of the Blazer was not the shooter. According to Detective Guerra's notes: "Chavez recalls that the driver of the Blazer yelled out ['T]ake [h]im to the hospital.' She states there's a possibity [sic] he never got out of the vehicle during the shooting. She recalls another male Hispanic in the back seat of the Blazer who said a dirty word. She states that neither of these two guys were the shooter[.]"

41.   On October 7, 1994, detectives Guerra and Leiker flew to Miami to show Chavez the photographic lineups. Although Chavez selected a number of people (both from display cards "A" and "B") as looking like various people she saw that night and described each of their roles in the incident, Chavez did not identify Jimenez as the man who had shot her friend.

42.   All in all, Chavez provided much more detail than that provided by other witnesses, including: one of the first two Harpys who were at the scene grabbed the victim's gold chain and yanked it off before the shooting; the shooter was hiding behind one of the original two Harpys, the one who was doing all the talking; the shooter was probably not involved in the fight; the driver of the Blazer never got out of the car; the driver of the Blazer told her to take the victim to the hospital; someone in the Blazer said a dirty word; neither the driver of the Blazer, nor the guy in the back who said the dirty word, was the shooter. The police had already correctly identified Jimenez as the driver of the Blazer, and so the detectives were immediately aware that Chavez's statement exculpated Jimenez. Despite this confirmation that Jimenez was not the shooter and despite the absence of any reliable inculpatory evidence, Jimenez remained the detectives' only target. They continued their investigation of Jimenez and omitted Chavez's exculpatory statements from their official typed reports (and by extension the arrest warrant affidavit, which was predicated on the investigation reports), as well as from the search warrant affidavit. Chavez's statements were buried in illegible handwritten notes, ensuring that they would not be discovered by the prosecution or the defense.

43.   Detective Guerra prepared two typewritten formal investigative reports of the shooting that included a portion of Chavez's statements, but omitted significant material—in particular the statements exculpating Jimenez—and misattributed other material. Even though Chavez had provided a detailed description of the shooter, including a full description of his clothing (dark pants

and a dark three-quarter length shirt), that description was not attributed to Chavez in the official reports. Instead, it was erroneously attributed to Mayra Martinez, the State's only identifying witness, who had given no description of the shooter when she was interviewed, according to Detective Guerra's notes and Statement Form.

44.   All of Chavez's interview statements that pointed to Jimenez's innocence were excluded from those formal typewritten reports, including the following facts: 1) Chavez said multiple times that she could identify the shooter if she saw him again, yet she did not identify Jimenez as the shooter when presented with his photograph, as noted in the Follow-up Investigation Report; 2) Chavez said she did not believe the driver of the Blazer ever got out of the vehicle, which corroborated Jimenez's claim that he never got out of his Blazer when he drove to the gas station; 3) Chavez said that the driver of the Blazer called out "take him to the hospital," which also corroborated Jimenez's later trial testimony; and 4) Chavez said that the driver of the Blazer was not the shooter.

45.   As set forth above, the detectives were aware of the exculpatory nature of this information because Officer Fuentes had already told the detectives that Jimenez was the person in the driver's seat, driving the Blazer away from the gas station. This fact was memorialized in Detective Guerra's affidavit in support of the warrant to search Jimenez's home. In that affidavit, she swore that, "Officer Fuentes stated he observed the *driver of the blue Blazer vehicle* to be Arturo Jimenez." (emphasis added) Detective Guerra also swore that, "Witness Martinez observed the suspect shoot the victim two times and enter the vehicle that Officer Fuentes observed fleeing the location *driven by Arturo Jimenez*." (emphasis added) Although these statements exculpated Jimenez, the court remained ignorant of that fact because Detective Guerra omitted from her affidavit that Chavez had told her the driver of the Blazer was not the shooter.

46.   Detective Guerra's affidavit noted that Mayra Martinez had identified Jimenez as the shooter. However, the affidavit failed to inform the court that the

other three eyewitnesses, all of whom were outside of the car and closer to the shooter than Martinez, had not selected Jimenez's photograph as the shooter. The court also had no way of knowing that Chavez—the only witness who was standing right next to the victim, who had described the shooter, and who said she would recognize him if she saw him again—had not selected Jimenez's photo as the shooter. More importantly, Detective Guerra omitted from her affidavit the fact that Chavez had specifically eliminated the driver of the Blazer as the shooter, whom law enforcement had already determined to be Arturo Jimenez. The Municipal Court Judge, with no way of knowing any of this exculpatory information, or that the representations made to the Court were false and misleading, signed the search warrant on November 1, 1994. On November 4, 1994, police conducted searches on the homes of Jimenez and his relatives, the Aceveses. No weapon or any other inculpatory evidence was found.

47.   Although the detectives showed Harpys gang books and photographs of other known or suspected Harpys members to the Colmenarez witnesses, and although the witnesses selected other photographs of persons they believed may have been present, none of those persons were interviewed or meaningfully investigated.

## C.   ARREST, PROSECUTION, AND CONVICTION

48.   On or about November 17, 1994, Detectives presented the case against Arturo Jimenez to the district attorney's office, submitting a form probable cause affidavit attaching seven pages of reports and statements. As detailed above, these reports and statements presented false information, misrepresented witness statements, and omitted material exculpatory information, including the suggestive and improper eyewitness identification techniques that produced Martinez's erroneous identification and the statements by Chavez and Fuentes establishing that Jimenez was the driver of the Blazer and that the driver of the Blazer was not

the shooter. The district attorney's office filed one count of first-degree murder against Jimenez based on the detectives' presentation.

49.   Jimenez's trial began on April 25, 1995. Jose Montes and Llamily Chavez did not testify. Mayra Martinez testified that she saw the shooter enter the *passenger's side* of the Blazer. She also stated that she was initially 90% sure of her identification of Jimenez but, at the time of trial, had no doubt about her selection. Detectives Guerra and Leiker both vouched for Martinez in their testimony, stating, falsely, that when Martinez was shown the six-pack, she unequivocally identified Jimenez as the shooter and expressed no doubts about her selection.

50.   Gabriel Casas testified, but explicitly did not identify Jimenez as the shooter. Casas insisted that he told the police the shooter went toward the Blazer and not into the Blazer. He also stated that he never saw anyone get out of the Blazer. Nevertheless, the prosecutor, through the testimony of Detectives LaBarbera, Guerra, and Leiker, was able to present Casas's alleged earlier statements to police, which were inconsistent with his trial testimony, as substantive evidence. LaBarbera testified that Casas stated in his original interview that he (Casas) did in fact see the shooter get in the *passenger side* of the Blazer. Detectives Guerra and Leiker testified that Casas identified Jimenez in the six-pack, but became uncooperative to avoid snitching on another gang member.

51.   In light of Martinez's testimony that the shooter entered the passenger side of the vehicle and the statement attributed to Casas by Detective LaBarbera, Officer Fuentes changed his story and falsely testified that he observed Jimenez in the passenger seat of the Blazer as it drove away from the scene. As set forth above, this directly contradicted multiple police reports and a sworn search warrant affidavit which stated that Officer Fuentes observed Jimenez *driving* the Blazer away from the scene. Fuentes would testify at least five times that Jimenez was not driving the Blazer, but he was instead in the passenger seat. Neither Officer

Fuentes nor any of the detectives ever corrected this false testimony, or advised the trial prosecutor that the testimony was false.

52.   During deliberations, the jury asked for a read-back of a portion of Mayra Martinez's testimony regarding the shooter's clothing. They also asked for a better copy of her witness Statement Form. At the end of a full day of deliberations, the jury reached a verdict, which it announced the following day. The jury found Jimenez guilty of first-degree murder and found true the allegation that he personally used a firearm.

53.   Three weeks after the verdict, Chavez was speaking to a neighbor of Jimenez's relatives in the San Fernando Valley, and when the Jimenez prosecution came up in conversation, told the neighbor that she was present at the gas station and knew that Jimenez (the person being prosecuted) was innocent. Jimenez's family learned of the conversation and provided the information to Jimenez's attorney.

54.   On June 7, 1995, Jimenez filed a motion for a new trial arguing that Chavez's subsequent statements regarding the murder constituted newly discovered evidence. Jimenez argued that the court should hold an evidentiary hearing on the motion for a new trial because Chavez would be able to testify that the Blazer arrived only after the shooting.

55.   The prosecution argued that the court should deny a hearing on the motion for reasons that were demonstrably false in light of Chavez's statements to the Defendant detectives that were unknown to the prosecutor. First, the prosecutor told the court that, "As I laid out in my opposition, your Honor, [Chavez] was identified, spoken to by the police on the night in question, the night of the killing [and] . . . at no time did she . . . make a statement which matches this statement that is now being presented to the Court." This was false. Eight days after the murder, Chavez told Detective Guerra that the driver of the Blazer was not the shooter. That statement was completely consistent with the statement Chavez had made to

the neighbor: The driver of the Blazer, the guy who had just been convicted, was innocent. The prosecutor also told the court that Chavez's statements to the police were "substantially similar" to the statements and testimony from Mayra Martinez and Gabriel Casas, and that Chavez "brings nothing to the trial that wasn't already brought in through some other source." This was also false. The jury never heard that Chavez (a) had described the shooter, (b) told the detectives she could identify him if she saw him again, (c) did not identify Jimenez as the shooter when presented with his photograph, and (d) had stated that the driver of the Blazer was not the shooter. Moreover, Chavez provided details about the incident that none of the other witnesses did, including details that proved Jimenez was telling the truth about his innocence. She was also the most percipient eyewitness, as she was standing right next to the victim when he was shot. These statements were deliberately suppressed by the Detectives, with the result that neither the prosecutor, nor the defense attorney, brought them to the attention of the jury or the court.

56.   Over the prosecution's objections, the court held an evidentiary hearing on the motion for a new trial. On July 7, 1995, Chavez testified through a Spanish interpreter. She was examined regarding her statements to the police as reflected in police reports. Neither the defense nor the prosecution questioned Chavez regarding the exculpatory statements that she made to the detectives that were omitted from the official reports, and that information was never disclosed to the Court. The court denied the motion for a new trial.

57.   On July 7, 1995, Jimenez was sentenced to 30 years to life in prison (25 years to life for the murder and a 5-year consecutive enhancement for personal use of a firearm). Judgment was entered.

/ / /

/ / /

## D.    POST-CONVICTION INVESTIGATION & PROCEEDINGS

58.    Post-conviction investigation revealed the true identity of the shooter: Oscar Sanchez. In 1994, Oscar Sanchez was a resident of Los Angeles and member of the Harpys gang. His gang name was "Sneaky."

59.    For several years, Oscar Sanchez dated, and lived with, a woman named Diana Valtierra. In 1998, when they were living together, Sanchez confessed to Valtierra that he had shot and killed the victim at the gas station near their home. He also admitted that another former Harpys member named "Shady" had been convicted of this murder and was serving time for the shooting Sanchez had committed.

60.    Sanchez told Valtierra the shooting took place at the gas station on the corner of 22nd and Vermont Avenue (about three blocks from the home they shared). He explained that he had been on his way to Hoover Park to hang out when he saw a fight going on at the gas station. He stopped, got out of the car, shot a rival gang member who was fighting with a group of Harpys, and then got back in the car and took off. Over time, Valtierra became aware that several of Sanchez's friends also knew that he had committed the murder.

61.    In 2000, Valtierra ended her relationship with Sanchez when he became violent with her. Years later, she visited Sanchez. At that time, Sanchez was disabled and suffering from conditions that eventually led to his death. Valtierra encouraged Sanchez to make peace with himself by coming forward and admitting that he was the true killer. Sanchez refused, however, because he hoped to recover and did not want to go to prison. Oscar Sanchez died shortly thereafter, in 2008.

62.    Other individuals corroborated Oscar Sanchez's confession to Valtierra. Carlos Gallardo, a former Harpys member serving a life sentence, learned of Jimenez's conviction and reported that he, too, had heard a confession from the true shooter. According to Gallardo, a Harpy member named "Sneaky" (Oscar Sanchez) told him that Jimenez was "doing [Sneaky's] time," meaning that

he was serving prison time for a crime that Sneaky committed. Likewise, Armando Aceves (one of Jimenez's biological brothers) has admitted that he was one of the first two individuals who approached Colmenarez and was present for the shooting. He stated that he saw "Sneaky" (Oscar Sanchez) approach and shoot the victim. Armando Aceves did not come forward at first because he believed that Jimenez, who was innocent, would not be convicted.

63.   These witnesses provided descriptions of Oscar Sanchez that match descriptions given by the Colmenarez witnesses, including that Sanchez was short (5'5" to 5'6") and had a dark complexion.

64.   On January 15, 2020, Jimenez filed a petition for writ of habeas corpus seeking to vacate his conviction on the basis of new evidence of innocence, ineffective assistance of counsel, and prosecutorial failure to correct false trial testimony. On April 10, 2020, while his petition was pending, Jimenez was found suitable by the Board of Parole Hearings and released on parole.

65.   On July 10, 2020, the Los Angeles County District Attorney's Office filed an informal response agreeing that Jimenez had satisfied the initial burden of pleading adequate grounds for relief and was entitled to an evidentiary hearing. On August 11, 2020, after further review, the District Attorney's Office conceded the petition, agreeing that Jimenez was denied the effective assistance of counsel. The District Attorney's Office asked the Court to vacate Jimenez's conviction and moved to dismiss all charges against Jimenez in the interests of justice pursuant to Penal Code section 1385.

66.   On August 12, 2020, the Court granted Jimenez's petition for writ of habeas corpus, vacated his conviction, and dismissed all charges against him. On February 1, 2021, the District Attorney and Jimenez filed a joint motion for finding of factual innocence by a preponderance of evidence, which was granted by the Superior Court on February 2, 2021.

## VI.   PARTICIPATION, STATE OF MIND, AND DAMAGES

67.   With respect to the acts and/or omissions alleged herein, each individual Defendant acted illegally and without authorization.

68.   Each individual Defendant participated in the violations alleged herein, and/or directed the violations alleged herein, and/or knew or should have known of the violations alleged herein and failed to act to prevent them. Each Defendant ratified, approved or acquiesced in the violations alleged herein.

69.   As joint actors with joint obligations, each individual Defendant was and is responsible for acts and/or omissions of the other.

70.   Each individual Defendant acted individually and in concert with the other Defendants and others not named in violating Plaintiff's rights.

71.   With respect to the acts and/or omissions alleged herein, each Defendant acted deliberately, purposefully, knowingly, recklessly and/or with deliberate indifference. Each Defendant's acts and/or omissions were done with deliberate indifference to, or reckless disregard for, Plaintiff's rights or the truth in engaging in the conduct alleged herein.

72.   As a direct and proximate result of the described acts, omissions, customs, practices, policies, and decisions of the Defendants, Plaintiff was wrongfully arrested, prosecuted, convicted, and incarcerated for over twenty-five years.

73.   As a direct and proximate result of his wrongful arrest, prosecution, conviction, and incarceration, Plaintiff lost his liberty and the quality and enjoyment of his life both during his period of incarceration and thereafter.

74.   As a direct and proximate result of his wrongful arrest, prosecution, conviction, and incarceration, Plaintiff has suffered, continues to suffer, and is likely to suffer in the future, extreme and severe mental anguish, mental and physical pain and injury, fright, nervousness, anxiety, shock, humiliation,

indignity, embarrassment, harm to reputation, and apprehension. For such injuries, he has incurred and will incur in the future significant damages.

75.   As a direct and proximate result of his wrongful arrest, prosecution, conviction, and incarceration, Plaintiff has lost past and future earnings.

76.   As a direct and proximate result of his wrongful arrest, prosecution, conviction, and incarceration, Plaintiff has been deprived of existing familial relationships, the society and companionship of existing friends and family, and the opportunity to get married and raise a family.

77.   The acts and/or omissions of Defendants, and each of them, were willful, wanton, malicious, oppressive, in bad faith, and done knowingly, purposefully, and/or with deliberate indifference to and/or reckless disregard for Plaintiff's constitutional rights or the truth, entitling Plaintiff to exemplary and punitive damages from each individual Defendant.

78.   By reason of the acts and/or omissions of the Defendants, and the injuries caused thereby, Plaintiff was required to retain an attorney to institute and prosecute the within action, and to render legal assistance to Plaintiff, that he might vindicate the impairment of his rights and resulting injuries. By reason thereof, Plaintiff requests payment by Defendants of reasonable attorney's fees and costs.

## VII.   CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

### DEPRIVATION OF CIVIL RIGHTS BY INDIVIDUAL DEFENDANTS

### 42 U.S.C. § 1983

### (Against All Individual Defendants and Does 1-10)

79.   Plaintiff realleges all foregoing paragraphs and any subsequent paragraphs contained in this complaint, as if fully set forth herein.

80.   Defendants GUERRA, LEIKER, LaBARBERA, FUENTES, and DOES 1 through 10, while acting under color of law, caused Plaintiff to be deprived of rights, privileges, and immunities secured by the Constitution and laws

COMPLAINT

of the United States, including the Fourth, Fifth, Eighth, and Fourteenth Amendments by, inter alia, fabricating evidence, failing to disclose material exculpatory evidence, failing to correct false evidence, using suggestive and improper eyewitness identification techniques resulting in false and unreliable identifications, and conducting a reckless investigation into the murder of Hugo Colmenarez. Defendants' acts and/or omissions that caused these violations were done with deliberate indifference to or in reckless disregard of Plaintiff's rights and the truth.

81.   Among other acts and omissions that violated Plaintiff's rights, Defendants, in particular Defendants GUERRA and LEIKER, violated Plaintiff's right to a fair trial free of unreliable eyewitness identifications tainted by police suggestion and/or influence, as set forth in *Manson v. Brathwaite*, 432 U.S. 98 (1977), *Neil v. Biggers*, 409 U.S. 188 (1972), and their progeny. Oscar Sanchez, not Plaintiff, was the person who shot and killed Hugo Colmenarez. The only eyewitness who identified Plaintiff, Mayra Martinez, was not able to make an identification of Plaintiff as the shooter, would not have made an identification without the improper influence of the Defendant detectives, and provided an identification that was rendered unreliable under the totality of the circumstances. Another eyewitness, Gabriel Casas, did not identify Plaintiff as the shooter, but nevertheless, his pretrial identification of Plaintiff as someone who was present and could not be ruled out as the shooter was used against Plaintiff at trial. Defendants' acts and/or omissions causing improper suggestion and influence include, but are not limited to: 1) constructing a biased photo array where only one photograph—belonging to Plaintiff—bore any resemblance to the generic description of the shooter given by eyewitnesses; 2) showing the photo array to eyewitnesses multiple times and for extended period of time; 3) suggesting and/or insinuating that the shooter was in the photo array; 4) pressuring eyewitnesses to make selections from the photo array; 5) providing, suggesting and/or implying

information or answers to eyewitnesses; 6) instructing one or mor witnesses to "keep looking" when a witness did not identify Jimenez; 7) advising one or more witnesses that s/he could not leave or go home until an identification was made; and 8) not using available procedures that would have reduced the likelihood of inaccurate and unreliable identifications.

82.    Among other acts and omissions that violated Plaintiff's rights, Defendants, in particular Defendants GUERRA, LEIKER, LaBARBERA, and FUENTES, violated Plaintiff's rights by fabricating evidence, leading to the presentation of false evidence at Plaintiff's trial, and by failing to correct false evidence presented at Plaintiff's trial. Oscar Sanchez, not Plaintiff, was the person who shot and killed Hugo Colmenarez. Defendants wrote and contributed to police investigatory materials that falsely reported information, events, and the statements of witnesses, as well as omitted material information, statements, and events, and Defendants generated false eyewitness identification evidence that was used against Plaintiff at trial. Defendants' acts and/or omissions leading to the presentation of false evidence either affirmatively or by omission of material information and failure to correct false evidence include, but are not limited to: 1) attributing statements and information to witnesses that they never stated or provided, such as a description of the shooter by Mayra Martinez that she never gave and statements by Gabriel Casas that he never made that the shooter entered the blue Blazer after the shooting; 2) omitting material information and statements made by witnesses, such as omitting from reports that Gabriel Casas, and other eyewitnesses, had been drinking heavily prior to the shooting and omitting from reports the fact that Mayra Martinez was in the victim's car during the shooting and Gabriel Casas jumped in the car as soon as he heard gunshots, obstructing their opportunity to witness events and make an identification; 3) portraying Mayra Martinez's identification of Plaintiff as a positive identification while omitting the circumstances of that identification including her inability to identify anyone for an

extended period of time and the improper influence applied to her; and portraying Jose Montes as making a "tentative" identification, when he did not make any identification, and omitting the statements by Montes distinguishing Plaintiff's appearance from the real shooter's appearance; portraying Gabrial Casas as having "recognized" the shooter in the photo display and identifying Plaintiff as someone who "could have been" the shooter, when he did not make any identification; and portraying Llamily Chavez as having "failed" to make an identification of Plaintiff, when in fact she excluded Jimenez (the driver of the Blazer) as the shooter; 4) causing and influencing witnesses to identify Plaintiff by using investigative techniques that were likely to yield false and unreliable information; and 5) failing to correct false testimony at trial, for example, Defendant FUENTES's false testimony that he observed Plaintiff in the passenger seat of the blue Blazer, when he actually saw Plaintiff driving the blue Blazer.

83.   Among other acts and omissions that violated Plaintiff's rights, Defendants, in particular Defendants GUERRA, LEIKER, and LaBARBERA, violated Plaintiff's rights by failing to disclose material exculpatory and/or impeachment evidence, as required by *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150 (1972), and their progeny. Oscar Sanchez, not Plaintiff, was the person who shot and killed Hugo Colmenarez. During the course of the investigation, Defendants obtained exculpatory and/or impeachment information that was either not disclosed at all or hidden in investigation materials where it was not discovered by the prosecution or the defense, including but not limited to: 1) statements by Llamily Chavez excluding Plaintiff as the shooter; 2) information that one or more of the eyewitnesses had been drinking heavily on the night of the shooting; 3) the true circumstances of, suggestive techniques used during, and improper influence applied to the purported eyewitness identifications of Plaintiff; and 4) descriptions of the shooter by eyewitnesses that did not correspond to Plaintiff's appearance.

84.   Among other acts and omissions that violated Plaintiff's rights, Defendants, in particular Defendants GUERRA, LEIKER, LaBARBERA, and FUENTES, violated Plaintiff's rights by continuing the investigation of Plaintiff and causing the arrest and prosecution of Plaintiff, when they knew, or were deliberately indifferent to or recklessly disregarded, the truth that Plaintiff was not the person who shot Hugo Colmenarez. Of the approximately ten to fifteen male Hispanics at the scene of the shooting, all reportedly members of the Harpys gang, the police only ever identified two persons who were present. Both of those persons were excluded by eyewitnesses as the shooter. Although Defendants were forced to suspend their investigation and prosecution of the other suspect as being nothing "more than an observer," Defendants persisted in the investigation, arrest, and prosecution of Plaintiff—who was also nothing more than an "observer"—by suppressing and omitting the credible evidence in their possession that he was not the shooter as well as by generating what they knew to be false and/or unreliable inculpatory evidence.

85.   The constitutional source of the violations and obligations asserted herein is primarily the due process clause of the Fifth and Fourteenth Amendments, and Plaintiff asserts both procedural and substantive due process violations. To the extent that the source of Plaintiff's rights is any constitutional or statutory source(s) other than the Due Process Clause, this claim is also predicated on such source(s).

86.   Defendants, and each of them, conspired and agreed to commit the above-described deprivations of Plaintiff's constitutional rights and acted jointly and in concert to deprive Plaintiff of his rights to be free from unreasonable seizures, to due process, to a fair trial, and to be free from groundless criminal prosecutions based on false and unreliable evidence.

87.   Defendants, and each of them, engaged in, knew about, or should have known about the acts and/or omissions that caused the constitutional deprivations

alleged herein and failed to prevent them and/or ratified/approved them and/or acquiesced to them.

88.   Defendants, and each of them, committed the aforementioned acts and omissions in bad faith and with knowledge that their conduct violated well-established law.

89.   As a direct and proximate result of Defendants' aforementioned acts and/or omissions, Plaintiff was injured as set forth in earlier paragraphs of this complaint and is entitled to compensatory damages according to proof.

90.   The aforementioned acts and omissions of Defendants were committed by each of them knowingly, willfully, maliciously, oppressively, and/or in reckless disregard of Plaintiff's rights. By reason thereof, Plaintiff is entitled to punitive and exemplary damages from Defendants according to proof.

## SECOND CLAIM FOR RELIEF
## DEPRIVATION OF CIVIL RIGHTS BY ENTITY DEFENDANTS
### 42 U.S.C. § 1983 (*Monell* Violations)
### (Against Defendant CITY)

91.   Plaintiff realleges all foregoing paragraphs and any subsequent paragraphs contained in this complaint, as if fully set forth herein.

92.   At all relevant times, Defendant CITY and the LAPD, an agency and subdivision of Defendant CITY, possessed the power and authority to adopt policies and prescribe rules, regulations, and practices affecting the operation of the LAPD and the actions of employees and/or agents of the LAPD, including customs, policies, and/or practices relating to police tactics, methods, investigations, arrests, evidence, and discovery; as well as to personnel supervision, performance evaluation, individual investigations, discipline, records maintenance, and/or retention.

93.   At all relevant times, Defendants GUERRA, LEIKER, LaBARBERA, FUENTES, and DOES 1 through 10, and each of them, were employees and/or agents of the LAPD and Defendant CITY and were under the direction and control of LAPD and Defendant CITY.

94.   Upon information and belief, at all relevant times, LAPD and Defendant CITY, with deliberate indifference to and/or reckless disregard for the safety security, and constitutional and statutory rights of persons such as Plaintiff and/or the truth, maintained, enforced, tolerated, ratified, permitted, acquiesced in, and/or applied policies, practices and/or customs with respect to the investigation and prosecution of crimes that were a moving force behind the constitutional violations alleged herein.

95.   Upon information and belief, at all relevant times, LAPD and Defendant CITY, with deliberate indifference to and/or reckless disregard for the safety security, and constitutional and statutory rights of persons such as Plaintiff and/or the truth, failed to institute policies or provide training that would enable police officers, agents and/or employees to handle the usual and recurring situations with which they must deal and would prevent the kinds of constitutional violations alleged herein, where the need for such policies and/or training was obvious.

96.   Upon information and belief, at all relevant times, the LAPD and Defendant CITY, with deliberate indifference to and/or reckless disregard for the safety, security, and constitutional and statutory rights of persons such as Plaintiff and/or the truth, had no established or clear policy when the need for such policy was obvious, did not provide adequate training and supervision, had an ongoing custom and practice of, and/or otherwise had a policy or practice that led to the constitutional violations herein alleged, as to the following issues: 1) a basic and standardized *Brady* policy that outlines and identifies the *Brady* obligations of police officers; 2) policies, practices, and customs to ensure that all exculpatory

and/or impeachment information was prominently communicated in a manner likely to ensure that it would be seen and understood by the prosecution and defense; 3) policies, practices, and customs to ensure that police officers provide full investigative material in a case to the prosecutor; 4) policies, practices, and customs to ensure that all exculpatory and/or impeachment evidence is referenced and accurately stated in the key case reports and documents; 5) policies, practices, and customs to ensure that police officers who hear false testimony call that fact to the attention of the prosecutor and/or otherwise correct that false testimony; 6) policies, practices, and customs to ensure that the interactions between a witness and a police officer are fully, completely, and accurately documented in a written report; 7) policies, practices, and customs to prevent unduly suggestive and improper eyewitness identification techniques and ensure that eyewitness identification procedures do not result in the creation of false and unreliable evidence; 8) policies, practices, and customs to prevent the presentation of investigation information in a selective, incomplete, inaccurate, and/or biased fashion that distorts the evidence and leads to the presentation of false and unreliable evidence at trial; 9) policies, practices, and customs to ensure that police officers comply with constitutional standards regarding false evidence, *Brady* disclosure, and/or eyewitness identification procedures; 10) policies, practices, and customs to ensure that incidents and complaints involving the fabrication of evidence, use of unduly suggestive and improper eyewitness techniques, suppression of exculpatory and/or impeachment information, and/or other investigatory misconduct is properly investigated and results in appropriate correction and discipline.

97.   Upon information and belief, at all relevant times prior to and since September 1994, the LAPD and Defendant CITY had knowledge of repeated allegations and instances of misconduct by police officers, employees, and/or agents of the LAPD in relation to the investigation and prosecution of criminal

offenses, including fabrication of evidence, use of unduly suggestive and improper eyewitness investigation techniques, suppression of exculpatory evidence, dishonesty, and abuse of authority, and either ratified, condoned, and/or acquiesced in such conduct, failed to investigate and correct such conduct, and/or otherwise allowed such conduct to persist such that it became Defendant's de facto policy, practice, and/or custom.

98.   The customs, policies, and/or practices of the LAPD and Defendant CITY were a moving force behind the constitutional violations alleged by Plaintiff in the First Claim for Relief and the resulting injuries to Plaintiff, entitling Plaintiff to compensatory damages according to proof.

**THIRD CLAIM FOR RELIEF**
**DEPRIVATION OF CIVIL RIGHTS BY ENTITY DEFENDANTS**
**42 U.S.C. § 1983 (*Monell* Violations)**
**(Against Defendant COUNTY)**

99.   Plaintiff realleges all foregoing paragraphs and any subsequent paragraphs contained in this complaint, as if fully set forth herein.

100. At all relevant times, Defendant COUNTY and the LADA, an agency and subdivision of Defendant COUNTY, possessed the power and authority to adopt policies and prescribe rules, regulations, and practices affecting the operation of the LADA and LAPD, as well as the actions of employees and/or agents of the LADA and LAPD, including customs, policies, and/or practices relating to police tactics, methods, investigations, arrests, evidence, and discovery; as well as to personnel supervision, performance evaluation, individual investigations, discipline, records maintenance, and/or retention.

101. The Los Angeles County District Attorney's Office, at the times relevant herein, had a custom, policy and/or practice of acting with deliberate indifference to defendants' due process rights by failing to have adequate

administrative systems or policies, and/or failing to train its employees and agents, regarding a) the suppression of critical impeachment and *Brady* evidence, b) preventing the presentation of false evidence, c) ensuring that eyewitness identification procedures were reliable and not the result of suggestive activities by law enforcement, and d) ensuring that all impeachment and exculpatory information is disclosed by law enforcement. These failures were particularly evident in serious felony cases where the evidence against the defendant was otherwise weak. The Los Angeles District Attorney's Office was able to obtain convictions in these "tough cases" as a result of these systematic, regularly occurring, and deliberate and/or tolerated failures.

102. For example, in 1979, the LADA prosecuted and convicted Kash Delano Register, just 18 years old, of a murder he did not commit. The prosecution suppressed exculpatory evidence and relied on false testimony to convict Register, and he spent over 34 years in prison until it was finally revealed that the prosecutors at the District Attorney's Office had failed to produce impeachment and exculpatory evidence to the defense at the time of trial, among other errors.

103. In 1980, members of the Los Angeles District Attorney's Office relied on testimony by a key jailhouse informant witness, Edward Floyd Fink, to convict Thomas Goldstein of murder. Fink falsely testified that he received no benefits for his testimony even though he pled guilty and received a District Attorney recommendation of a maximum of County Jail time in a pending Grand Theft case, which recommendation was conditioned on Fink subsequently providing satisfactory testimony in the Goldstein murder case. His plea and its terms, though known to some members of the District Attorney's Office, were not communicated to the Goldstein trial prosecutor and were never disclosed to the defense.

104. In 1981, members of the Los Angeles District Attorney's Office relied on testimony by a key witness, William Acker, known to be mentally unstable and a serial liar, to obtain a conviction against Jesse Gonzales, who was sentenced to

death. It was discovered decades later that the Los Angeles District Attorney's Office had in its possession at the time of trial six psychological reports prepared by prison psychologists indicating that Acker had a severe personality disorder and was possibly schizophrenic, which were not disclosed to the defense prior to or at the time of trial.

105. Members of the Los Angeles District Attorney's Office knowingly used false testimony by serial informant Leslie White in a 1981 pre-trial proceeding in *People v. Bonin*, a capital case. White was subsequently rewarded with multiple furloughs from jail and a reduced sentence, but those benefits were never disclosed to the defense. Although at least some members of the Los Angeles District Attorney's Office were aware that White was willing to present false testimony even against defendants facing the death penalty, other members of the Los Angeles District Attorney's Office continued to use White as a key prosecution witness in other cases, such as the case against Michael Moore, who was tried for a murder of a police officer that occurred in 1982. Although members of the Los Angeles District Attorney's Office systematically provided benefits to White after his testimony in these cases, he was presented as a prosecution witness and permitted to falsely testify in Moore's case that he was not receiving any benefits in exchange for his testimony, even though he was.

106. In 1982, Adam Miranda was convicted of first degree murder with a robbery murder finding and sentenced to death. In 2008, his sentence was vacated when the California Supreme Court determined that the prosecution had failed to disclose material exculpatory evidence to the defense in the form of numerous items of evidence pointing to the prosecution's witness, Joe Saucedo, as having confessed to killing the victim. At Miranda's trial, Saucedo testified that Miranda had killed Hosey and that Saucedo had tried to stop him. None of the evidence impeaching Saucedo was disclosed to the defense at the time of Miranda's trial.

107. In 1982, James Shortt was convicted, largely on the basis of the testimony of notorious jailhouse informant Stephen Cisneros, who (as he later testified) presented false evidence that Shortt had made incriminating statements to him in exchange for which he received sentencing benefits, which benefits were known to members of the Los Angeles District Attorney's Office and never disclosed to the defense. Members of the Los Angeles District Attorney's Office also failed to disclose psychiatric testimony, a psychiatric report, and two probation reports negatively reflecting on Cisneros's credibility. On October 16, 2009, the Ninth Circuit overturned Shortt's conviction on the basis that material, exculpatory information concerning Cisneros had not been disclosed.

108. In 1983, members of the Los Angeles District Attorney's Office prosecuted Anthony Stacy on three counts of first-degree murder by relying on testimony by a witness whose FBI rap sheet revealed thirty arrests and convictions. Nearly 20 years later, in 2002, the Court of Appeal found that the Los Angeles District Attorney's Office had failed to disclose the obvious impeachment evidence concerning the government's key witness and vacated Stacy's conviction. Tellingly, the Los Angeles District Attorney's Office explained that its policy at the time was not to turn over FBI rap sheets, even those containing impeachment evidence valuable to the defense, unless the defense specifically requested it.

109. In 1984, the Los Angeles District Attorney's Office charged Bobby Maxwell with murdering ten men in downtown Los Angeles. Maxwell was convicted largely on the testimony of a witness, Sidney Storch, who the prosecution knew or should have known was an inveterate liar. A federal court reversed Maxwell's conviction 25 years later, in 2009, when it was discovered that members of the Los Angeles District Attorney's Office had suppressed impeachment evidence concerning the details of the key witness's plea negotiations, which evidence established that Storch was sophisticated and contradicted the naivete he professed at trial. After Maxwell's trial, Storch went on

to testify as a prosecution witness at two trials in 1985, *People v. Stephen Naquin* and *People v. Carl Jones*, and lied at both trials about the benefits he received for testifying in the Maxwell case, among other lies.

110. In 1985, Barry Williams was convicted of first-degree murder and sentenced to death. A federal court overturned his conviction 35 years later, in 2016, after concluding that the prosecution relied on false testimony by an unreliable witness and that the prosecution failed to turn over to the defense critical information about a key eyewitness, which the court found "deeply troubling."

111. In 1986, Andrew Wilson was convicted and sentenced to life in prison without the possibility of parole, based on the testimony of Saladena Bishop, which the Los Angeles District Attorney's Office knew or should have known was false and unreliable, and regarding which various items of material evidence was withheld. The Deputy District Attorney's failure to disclose critical impeachment evidence about Bishop's reported history of drug use and prior assaults on the victim, filing of a false police report, and suggestive eyewitness tactics by law enforcement, among other due process errors, caused the District Attorney's Office to concede, decades later, that Wilson was deprived of his right to a fair trial, and he was ordered released after 32 years in prison.

112. In 1989, the Los Angeles District Attorney's Office charged Gerald Atlas with attempted murder and conspiracy to commit murder based on the testimony of an eyewitness, Galvez, whom the prosecution knew had a year earlier pled guilty to felony murder, been placed on probation, and then violated her probation. Atlas was convicted and sentenced to 28 years to life in prison. In 1998, Atlas's conviction was vacated following post-conviction proceedings in which Atlas presented evidence showing that the prosecution failed to turn over impeachment evidence to the defense concerning Galvez's prior conviction at the time of trial.

113. In 1992, Michael Smith and Timothy Gantt were arrested for the stabbing murder of a college student. Sterling Norris, the same deputy district attorney who knowingly permitted Leslie White to testify falsely in the Bonin case in 1981, filed charges based almost entirely on a statement by an in-custody witness, David Rosemond, who said he had seen the attack on the student. Smith and Gantt were convicted and sentenced to life in prison without the possibility of parole. In a post-conviction evidentiary hearing, Rosemond recanted his identification and said he was coerced by police to identify Gantt and Smith. A federal judge found that material evidence had not been disclosed to the defense and set aside Gantt's conviction. Smith's conviction was also vacated.

114. In 1995, Obie Anthony and Reggie Cole were wrongfully convicted for a murder for which neither had any involvement. In 2011, the Los Angeles County Superior Court found that a "sweetheart" deal was given to the prosecution's key witness, John Jones, "an inherently unreliable witness," in his own prosecution for pimping and pandering, as an undisclosed "quid pro quo" for his testimony against Anthony and Cole. Both police and members of the Los Angeles District Attorney's Office denied the existence of the quid pro quo deal and concealed the benefits received by John Jones in return for his testimony, and this information was not communicated to the prosecutor who tried the Anthony/Cole case. At trial, John Jones testified falsely that he did not receive any special consideration, which testimony was not corrected by the prosecution.

115. Consistent with and further illustrating the Los Angeles District Attorney's Office custom, policy and practice of deliberate indifference to defendants' due process rights, the Report of the 1989-90 Los Angeles County Grand Jury ("Report") concluded that the District Attorney's Office had an unchecked and uncontrolled custom, policy and practice of permitting individual prosecutors to extend benefits to witnesses who testified for the prosecution, even when it was known that the witnesses were providing false evidence.

116. The Report focused on prosecutors' use of unreliable informant testimony and concluded that between 1979 and 1990, "the Los Angeles District Attorney failed to fulfill the ethical responsibilities required of a public prosecutor by its deliberate and informed declination to take the action necessary to curtail the misuse of jail house informants." The "misuse of jail house informants" is merely another way of saying "knowingly presenting unreliable and fabricated evidence," and "failing to disclose impeachment evidence regarding those witnesses as required under Brady." The core constitutional violation is one and the same.

117. Trial transcripts and appeals from numerous serious felony convictions obtained during that same time period show that the systematic unethical and illegal conduct by members of the Los Angeles District Attorney's Office's described by the Report was not limited to witnesses who were jailhouse informants. Members of the District Attorney's Office, throughout the 1980s and early 1990s—when Jimenez was convicted—systematically and knowingly presented as a matter of policy testimony by unreliable key witnesses in serious felony cases, provided undisclosed benefits to those witnesses, and failed to turn over impeachment evidence to the defense about those key witnesses.

118. That the serial use of false and fabricated evidence was a custom, policy and practice of the Los Angeles District Attorney's Office is demonstrated by the Grand Jury Report's finding that "[t]he investigation failed to identify a single case of prosecution of an informant for perjury or for providing false information, despite the fact that numerous cases of this nature were discovered during this inquiry."

119. The Report makes clear that the District Attorney's Office was, as a matter of policy, deliberately indifferent to the constitutional rights of defendants in serious felony cases leading up to and during the period when Jimenez was tried and convicted. In 1987, when the District Attorney's Office discussed the issue of needing to create an index that documents information on prosecution witnesses

whose reliability was questionable, "[n]either a defendant's right to know about information affecting the credibility of an informant, nor a prosecutor's obligation to disclose such information to a defendant, was ever mentioned during the discussion of the pros and cons of an informant index, according to all sources of evidence presented to the Grand Jury." The Report noted that the District Attorney's Office determined not to create a central repository of information on these prosecution witnesses because "the defense might discover the information in the index" and it may be determined that defendants' right to counsel was being violated by the prosecution's tactics.

120. The Report also states that one management official at the Los Angeles District Attorney's Office explained that in his or her experience, "over the years in tough cases . . . where we have filed a case and we know the defendant did it, but the amount of available evidence is a little on the thin side, and a statement would be helpful, that sooner or later those statements become available to us." The representative of the District Attorney's Office added that this was "a fairly common practice." In other words, the common practice was that in tough cases where the evidence was thin, badly needed witness testimony would materialize— one way or another—to ensure that the District Attorney's Office obtained the convictions it sought.

121. Providing the information to allow the defense a full and fair cross-examination of government witnesses whose testimony is important to the outcome of the case is critical to due process. The suppression of material impeachment evidence, particularly for key state witnesses, often requires the reversal of a conviction or the vacating of a sentence, but such violations typically take decades to uncover. The violations that have been uncovered to date are not isolated cases. These cases provide strong evidence that there were customs, policies practices or failures in place whereby countless defendants were denied their due process rights, as Jimenez was.

122. In Jimenez's case, as with many other cases involving serious felony convictions obtained in the 1980s and 1990's, critical impeachment evidence concerned key prosecution witnesses was not disclosed and remained buried for decades, while false and misleading evidence was allowed to be presented. Exculpatory evidence was suppressed pursuant to the District Attorney's Office's customs, policies practices and failures under which impeachment evidence relating to key prosecution witnesses, who were known by the prosecution to be unreliable, was not disclosed. This was particularly so in tough cases, such as Jimenez's where the evidence was thin, and would be significantly undermined by the suppressed exculpatory and impeachment evidence.

123. As the foregoing recitation of known cases demonstrates (and there are, by definition, many more that are not known), the Los Angeles District Attorney's Office, throughout the 1980's and 1990's, systematically failed to have systems or established policies in place, and to train and supervise its attorneys, to prevent the use of false evidence and to require the full and prompt production of exculpatory evidence to the defense. It similarly failed to ensure that trial attorneys knew, learned of, and disclosed exculpatory evidence; to provide the means and information to determine whether evidence was reliable; to ensure that its trial attorneys learned all important information for a case, including exculpatory evidence. Throughout this period, it had no established policies, systems, training or supervision for meeting constitutional standards for a) turning over exculpatory evidence, b) preventing the presentation of false evidence, c) ensuring that eyewitness identification procedures were not suggestive and were reliable, or d) tracking evidence it was constitutionally obligated to learn and disclose.

124. Upon information and belief, and as alleged above, during the 1980s and 1990s, the LADA and Defendant COUNTY had knowledge of repeated allegations and instances of misconduct by members of the prosecution team, including prosecutors, police officers, and employees and/or agents of the LAPD

and LADA in relation to the investigation of criminal offenses prosecuted by the LADA, including fabrication of evidence, use of unduly suggestive and improper eyewitness investigation techniques, suppression of exculpatory and impeachment evidence, dishonesty, and abuse of authority. All of the foregoing customs, policies practices and failures occurred with deliberate indifference to the rights of criminal defendants, including Plaintiff Jimenez, and even though members of the supervisory staff of the District Attorney's Office were or should have been aware of these customs, policies practices and failures.

125. These customs, policies practices and failures were so closely related to the deprivation of the plaintiff's rights as to be a moving force that caused his wrongful conviction. Due to these customs, policies, practices and failures, Jimenez was deprived of his right to a fair trial. Had the prosecutors here been properly trained and supervised, and had there been proper systems and policies in place, they would have learned and disclosed the use of false evidence, the suppression of exculpatory evidence, and the practices of influencing witness testimony, contrary to their constitutional obligations, and such disclosures would have been routine practice.

## FOURTH CLAIM FOR RELIEF
## DEPRIVATION OF CIVIL RIGHTS
### California Civil Code § 52.1
### (Against All Individual Defendants and Defendant CITY)

126. Plaintiff realleges all foregoing paragraphs and any subsequent paragraphs contained in this complaint, as if fully set forth herein.

127. Defendants GUERRA, LEIKER, LaBARBERA, FUENTES, and DOES 1 through 10, while acting under color of law, caused Plaintiff to be deprived of rights, privileges, and immunities secured by the Constitution and laws of the United States and the State of California, by, *inter alia*, fabricating evidence,

failing to disclose material exculpatory evidence, failing to correct false evidence, using suggestive and improper eyewitness identification techniques resulting in false and unreliable identifications, and conducting a reckless investigation into the murder of Hugo Colmenarez. Defendants' acts and/or omissions that caused these violations were done with deliberate indifference to or in reckless disregard of Plaintiff's rights and the truth.

128. In committing the constitutional violations alleged herein, and by abusing their authority as law enforcement officers, Defendants interfered or attempted to interfere with Plaintiff's rights secured by the United States and California constitutions and laws, through the use of threats, intimidation, or coercion.

129. At all relevant times, Defendants GUERRA, LEIKER, LaBARBERA, FUENTES, and DOES 1 through 10, and each of them, were employees and/or agents of the LAPD and Defendant CITY; were under the direction and control of LAPD and Defendant CITY; and were acting within the course and scope of their employment.

130. As a direct and proximate result of Defendants' aforementioned acts and/or omissions, Plaintiff was injured as set forth in earlier paragraphs of this complaint and is entitled to compensatory damages according to proof.

131. The aforementioned acts and omissions of Defendants were committed by each of them knowingly, willfully, maliciously, oppressively, and/or in reckless disregard of Plaintiff's rights. By reason thereof, Plaintiff is entitled to punitive and exemplary damages from Defendants according to proof.

## VIII.    PRAYER FOR RELIEF

WHEREFORE Plaintiff ARTURO ACEVES JIMENEZ prays for judgment against each Defendant and requests relief against Defendants, jointly and severally, and according to proof, as follows:

a.    General and compensatory damages in an amount according to proof;

     b.     Special damages in an amount according to proof;

     c.     Exemplary and punitive damages against each individual Defendant in amounts according to proof;

     d.     Costs of suit, including attorneys' fees, as provided by, *inter alia*, 42 U.S.C. § 1988;

     e.     Such other relief as may be warranted or as is just and proper.


            Respectfully submitted,

            McLANE, BEDNARSKI & LITT, LLP

DATED:  September 2, 2021    By:  */s/  Caitlin S. Weisberg*
                     BARRETT S. LITT
                     DAVID S. McLANE
                     CAITLIN S. WEISBERG
                     Attorneys for Plaintiff ARTURO ACEVES JIMENEZ


## JURY DEMAND

     Trial by jury of all issues is demanded.


DATED:  September 2, 2021    By:  */s/  Caitlin S. Weisberg*
                     BARRETT S. LITT
                     DAVID S. McLANE
                     CAITLIN S. WEISBERG
                     Attorneys for Plaintiff ARTURO ACEVES JIMENEZ

COMPLAINT